Melissa A. Peña
NORRIS McLAUGHLIN & MARCUS, P.A.
875 Third Avenue – 8th Floor
New York, New York 10022
Tel: (212) 808-0700
Fax: (212) 808-0844
E-mail: mapena@nmmlaw.com

Attorneys for Donald F. Campbell, Jr., Assignee

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 7 |
| SCANDIA SEAFOOD (New York) LLC, | Case No. 17-10744 (MEW) |
| Debtor. | |

**OPPOSITION OF DONALD F. CAMPBELL, JR., ESQ., THE ASSIGNEE FOR THE BENEFIT OF SCANDIA SEAFOOD (NEW YORK), INC. TO THE PETITIONING CREDITORS' EMERGENCY MOTION FOR AN INTERIM TRUSTEE**

Donald F. Campbell, Jr., Esq., the Assignee for the Benefit of Scandia Seafood (New York), Inc. (the "Assignee") respectfully submits this opposition to the emergency motion filed by the petitioning creditors, Clear Water Fish Co., Inc., Beyer Lightning Fish Co., Inc., Joe Manani Fish Co., Universal Seafood, Inc., R&R Ocean Products Unlimited, Inc., Blue Harvest Foods LLC, Lockwood & Winart, Montauk Seafood Co., Inc., and JMS Seasonal Seafood Corp. (collectively the "Petitioning Creditors") for the appointment of an interim trustee ("Motion").

**PRELIMINARY STATEMENT**

1.      This proceeding and the Motion are nothing more than an ill-conceived attempt to insulate the Petitioning Creditors from liability to the assignment estate, and thereby deprive other creditors of the assignment estate their right to share equally in the assets of the estate.

2.      At all times relevant hereto, the Petitioning Creditors were on notice of the actions

undertaken in the Assignment of Benefit of Creditors ("ABC") proceeding. The Petitioning Creditors received notice of the proposed sale of the assets of Scandia Seafood (New York), LLC ("Scandia") and the proposed management agreement. While they complain they did not have sufficient notice of the sale motion to oppose same, which motion was processed expeditiously in order to preserve the seafood business, what the Petitioning Creditors do not tell this Court is that they were served with the January 13, 2017 Order approving the sale and management agreement (the "Sale Order"). Upon receipt of the Sale Order, the Petitioning Creditors did not file a motion for reconsideration nor did they appeal such Order. As of the filing of the involuntary petition, the deadline for them to have taken such actions had long expired. In addition, the Petitioning Creditors did not request any information from the Assignee in connection with the ABC proceeding informally or by subpoena.

3.      Indeed, other than filing proofs of claims in the ABC proceeding, it was not until the Assignee filed preference claims against them, pursuant to N.J.S.A. § 2A:19-3, that the Petitioning Creditors took action. With full knowledge that a bankruptcy case would eliminate $3 million in preference claims for the assignment estate, including $900,000 of liability for the Petitioning Creditors, the Petitioning Creditors filed the involuntary petition. It was at this point that the Petitioning Creditors had a problem with the sale process and saw the Bankruptcy Court as its "appellate court" to collaterally attack the Sale Order.

4.      Similarly, although this involuntary bankruptcy case was filed on March 28, 2017, the Petitioning Creditors waited nearly thirty days before filing their "emergency" motion for the appointment of an interim trustee. This Motion was filed after the Assignee informed the Petitioning Creditors that he intended to move to dismiss the case as a bad faith filing simply to avoid preference liability. Although the "safe harbor" provision does not apply to involuntary

petitions, on April 4, 2017, the Assignee sent the Petitioning Creditors notice of its intent to dismiss the case and seek sanctions unless the involuntary petition was withdrawn within a week. The Petitioning Creditors never responded to such letter or the allegations set forth therein that the case was nothing but an attempt to avoid preference liability.  There was utter silence in response to the allegations.

5.      Apparently, the Petitioning Creditors did not respond as they were developing a "factual record" in purported support of the Motion (a/k/a the early alleged defense to the Assignee's Rule 11 motion).  In their haste in creating the record, they overlooked the need to obtain a Declaration from a person with knowledge of the facts they attest to in seeking the extraordinary relief they are asking from this Court - to remove a fiduciary duly appointed by the New Jersey Superior Court.  In fact, the Petitioning Creditors' counsel did not even attest to the "facts" upon information and belief based on his investigation.

6.      As detailed in the Declaration of the Assignee (the "Assignee's Dec."), submitted herewith, there is no basis to find that an interim trustee is necessary to undertake the Assignee's responsibilities. The Assignee has properly accounted for Scandia's assets, obtained fair value for the sale of the assets and is properly pursuing and investigating causes of action held by the assignment estate.

7.      Not only is the Assignee properly managing the estate, rather than force this Court to address the factual allegations on an expedited basis, the Assignee is agreeable to ceasing all activity in the ABC proceeding pending an adjudication of his motion to dismiss the involuntary petition, which will be filed on May 1st (the deadline for the Assignee to respond to the involuntary petition).  As the Assignee has sold all of Scandia's assets (other than accounts receivables), what this means is the Assignee will not pursue any lawsuits, prosecute any existing

lawsuits, settle any claims or make any distributions to professionals or creditors. This will afford the Court the opportunity to review this case on a complete record.

## COUNTERSTATEMENT OF FACTS

8.      The Petitioning Creditors cobbled together a factual background from a series of documents filed in the ABC case and publicly available online.  None of the facts alleged by them are attested to or sworn to under oath by an individual with personal knowledge.  In fact, neither the Petitioning Creditors nor their counsel even signed a Declaration attesting to such facts "upon information and belief based on their investigation."

9.      Submitted herewith is the Assignee's Dec. which details what transpired in the ABC proceeding.  Below is a summary of such declaration outlining how each of the "myths" proposed by the Petitioning Creditors can easily be debunked.

**Myth #1 – Scandia concealed "what may be the most significant asset that it owns" and the Assignee "gifted" the prepared food business to the Insiders.**

10.      In purported support of their claimed need for an interim trustee, the Petitioning Creditors argue that Scandia concealed the existence of the "Nautical Foods" trademark and the prepared seafood line of the business that is allegedly being operated outside of the ABC proceeding.

11.      As an initial matter, although the Petitioning Creditors state throughout their motion that the trademark and goodwill associated with "Nautical Foods" is extremely valuable, the Petitioning Creditors offer no proof of such value.

12.      Furthermore, the trademark was accounted for by the Assignee and sold to Seafood Innovations LLC ("Seafood Innovations").  As detailed in the Assignee Dec., it was the intent of both the Assignee and Seafood Innovations for the trademark to be sold with the assets of Scandia.  Seafood Innovations' initial offer to purchase the assets included the trademark

"Nautical Foods". <u>See</u> Exhibit C. In response to Seafood Innovations' request for the trademark and customer list, the Assignee demanded an additional $10,000 from Seafood Innovations and the parties agreed to a purchase price of approximately $5,000 for the trademark and customer list. Assignee Dec. at ¶¶ 46-52.

13.    In reaching the $5,000 figure, the Assignee determined that the trademark of an insolvent corporation had little to no value. This was based on the fact that a prior prospective purchaser of the assets, Ace Endico, did not even request that the intellectual property be transferred to it. Moreover, as acknowledged by the Petitioning Creditors, the trademark was the collateral of North Mill Capital, LLC ("NMC"), Scandia's secured lender, and NMC consented to the sale of the trademark for such amount. <u>Id.</u> at ¶¶ 27, 48-50 and 52.

14.    The Assignee admits that the trademark was not identified in the sale agreement annexed to his sale motion. This was an error. At all times relevant hereto, it was the intent of the Assignee, Seafood Innovations and NMC that the trademark be included in the sale and it was contemplated in the purchase price. Should this Court grant the soon to be filed Motion to Dismiss filed by the Assignee, the Assignee intends to file a motion in the ABC proceeding to correct this error. <u>Id.</u> at ¶¶ 46-52.

15.    As to the Petitioning Creditors' claim that Seafood Innovations has somehow absconded with the prepared food side of the business, this could not be further from the truth. Prior to the sale of the assets, the Assignee sized up the assets of the company. The fresh food and prepared food lines of the business shared the same location, the same employees and the same customer lists, but used different equipment. The prepared food business was sold to Seafood Innovations as part of the sale of the assets to Seafood Innovations, which the Petitioning Creditors never sought to overturn in the ABC proceeding. <u>Id.</u> at ¶¶ 46-52.

16.     Although the Petitioning Creditors claim (again with no support) that the prepared food business was extremely lucrative, the evidence states otherwise.  The business lost funding from its secured creditor, NMC.  Id. at ¶ 17.

**Myth #2 – Seafood Innovations Did Not Pay Fair Market Value for Scandia's Assets.**

17.     Without any evidentiary support, the Petitioning Creditors allege that Seafood Innovations did not pay fair market value for Scandia's assets.  The appraisal obtained by the Assignee stated that the value of Scandia's assets, including leased equipment, totaled approximately $153,330.  Subsequent to the Assignee's receipt of the appraisal, he investigated and confirmed that approximately $110,000 of the appraisal amount consisted of leased equipment.  Prior to closing on any sale of the assets, the Assignee required that each of the lessors provide him with updated statements setting forth what was owed on each lease.  Thereafter, the assets were sold to Seafood Innovations for the sum of $45,000 and its assumption of the obligations under the leases to the tune of approximately $110,000.  Further, the assumption of liability by Seafood Innovations provided an avenue for the lessors to be paid on their claims against the assignment estate, which reduced the creditor body.  Id. at ¶¶ 43-44, 48-50 and Exhibits B, D and E.

18.     Certainly, the Assignee's conduct in investigating the leases and confirming that fair consideration was being paid for Scandia's assets establishes that he is the "honest broker" that the Petitioning Creditors allege is missing in this case.

**Myth #3 – The Insiders Obtained a $3 million Loan from North Mill Capital, LLC Approximately 90 Days Prior to the Assignment Proceeding.**

19.     The Petitioning Creditors attempt to paint this picture that the principals of Scandia took out a loan for $3 million approximately 90 days prior to the ABC; utilized the loan proceeds as they wished; and then paid back the loan to the detriment of unsecured creditors.

20.     Even though the credit line from NMC was $3,000,000, $3,000,000 was never drawn from the loan.  Approximately $1,000,000 was drawn from the line of credit and utilized by Scandia to refinance its existing loans of approximately $1,300,000 from Valley National Bank.  The refinanced loan was also secured by Scandia's assets. Id. at ¶¶ 15-16.

**Myth #4 – The Insiders of Scandia Received a Sweetheart Management Agreement, which Included Obtaining a $60,000 Loan from NMC that was paid back by the Assignment Estate.**

21.     The Petitioning Creditors claim that the insiders received a deal at the expense of the unsecured creditors because under the management agreement, Seafood Innovations was authorized to obtain financing up to $60,000 secured by a second lien on Scandia's assets.

22.     Because the Assignee could not operate the business, the management agreement allowed the business to operate in order to preserve the value of the business pending the sale. Given the nature of the business, if Scandia ceased operating even for a few days, its customers would be forced to locate a new source for seafood (both prepared seafood and fresh). Accordingly, Scandia entered into a management agreement with Seafood Innovations.  Id. at ¶ 33.

23.     The management agreement afforded Seafood Innovations with an opportunity to obtain financing to operate the business secured by a lien on Scandia's assets which was second in priority to NMC's lien. Id. at ¶ 36.  There is nothing nefarious about this authorization as it is no different than any other debtor in possession loan made in bankruptcy cases daily.

24.     Furthermore, the Petitioning Creditors' gripe is much ado about nothing as no loan was ever provided to Seafood Innovations.  Unable to obtain a loan to finance the business operation, a member of Seafood Innovations, Ellen Tucker, paid for the company's inventory during the management period.  Although Seafood Innovations received the profits from the

company during this time period, the Assignee required Seafood Innovations to provide it with an accounting to determine whether any profit paid by Seafood Innovations exceeded the cost of inventory it purchased. Seafood Innovations provided such accounting, which is being reviewed by the Assignee's financial advisors. Id. at ¶¶ 37 and 38.

**Myth #5 – The Petitioning Creditors Had No Opportunity to Oppose the Management Agreement and Sale of Scandia's Assets.**

25.    The Petitioning Creditors argue that they were not timely served with the Assignee's motion seeking the approval of the sale of Scandia's assets and approval of the management agreement. It should not be lost on this Court that the Petitioning Creditors were served with the January 13, 2017 Order approving the sale and management agreement (the "Sale Order"). Despite their allegations that they did not receive adequate notice of the sale motion, the Petitioning Creditors did not file a motion for reconsideration of the Sale Order. The Petitioning Creditors did not file an appeal of the Sale Order. The Petitioning Creditors did not even request information from the Assignee regarding the sale. In fact, the only action undertaken by the Petitioning Creditors was the filing of proofs of claims against the assignment estate. Id. at ¶¶ 57-58.

26.    After the Assignee sued the Petitioning Creditors for preferences, which was nearly two months from the entry of the Sale Order, the Petitioning Creditors commenced this involuntary bankruptcy case in order to avoid preference exposure and reset the clock to challenge the Sale Order.

**Myth #6 – The Assignee Has Allowed the Pescatore Receivable to Be Waived.**

27.    The Petitioning Creditors claim that the Assignee has allowed the accounts receivable due from Pescatore to be waived. This could not be further from the truth as Pescatore has offered to pay the accounts receivable over time. The only reason the Assignee

has not resolved such claim is that the accounts receivable continue to serve as NMC's collateral.

Once NMC is paid off in full, the Assignee will likely resolve the accounts receivable issue with

Pescatore.  Pescatore as expressed a willingness to do so.  Id. at ¶¶ 59-71.

28.     The Assignee's counsel is cognizant of the claim and there is no risk that counsel

will allow the claim to be barred under the New Jersey Entire Controversy Doctrine. Id.

**Myth #7 – The Creditor Body is Better Off if the $3 Million in Preference Claims are Not Pursued by the Assignee.**

29.     If this Court allows this involuntary bankruptcy case to proceed, the assignment

estate will lose approximately $3 million in preference claims.  In an effort to minimize the loss

of the most substantial asset of the assignment estate, the Petitioning Creditors have *somehow*

calculated the distribution to creditors.  The Petitioning Creditors claim that the creditors are

better off if such claims are not pursued because of the cost of pursuing such claims, the forty

percent contingency fee to the Assignee's professional and the 20% statutory fee to the Assignee,

(which fee the Assignee intends to adjust downward).

30.     What evidentiary support do the Petitioning Creditors have for exhibit T, which

sets forth the distributions to unsecured creditors when (i) the preferences are pursued; and (ii)

when the preferences are not pursued?  How are the Petitioning Creditors able to calculate the

distribution to the creditors when they do not have the following information:  (i) the total

amount of claims against the assignment estate (as some claims may be subject to dispute); and

(ii) the total estimated assets of the assignment estate, including claims against insiders (such as

fraudulent transfer claims).

31.     Who is the entire creditor body who will benefit from the loss of $3 million

preference claims?  According to the Petitioning Creditors, this creditor body does not include

the following creditors who have claims against the assignment estate and received no

preferences during the four months prior to the assignment proceeding:  Unorik Fresh, Inc.,

Platina Seafood Inc., Bosshart Electric LLC, P&G Trading and Robert Reiser and Co., Inc., who

hold in the aggregate approximately $800,000 in claims as well as many other creditors.  See

Assignee Dec. at Exhibit L and ¶¶ 79-80. The Assignee believes he has a fiduciary duty to these

creditors as well to ensure that they receive an equal distribution of Scandia's assets.

32.     The Petitioning Creditors ignore these creditors and boldly state without any of

the aforementioned information that "there is no mathematical model that can be constructed

from the administration of the ABC that provides *any* of the unsecured creditors with payment

on their claims in excess of the amount that they may be required to pay as contribution to fees

for professionals." See Motion at ¶ 6 (emphasis added).

**Myth #7 – An Interim Trustee is Needed to Investigate the Insiders' Conduct Prior to the Assignment.**

33.     No interim trustee is necessary to scrutinize the business affairs of the insiders.

The Assignee and his financial advisors have commenced this investigation.  Subpoenas have

been served for bank records.  Upon completion of this investigation, the Assignee shall pursue

claims to recover any transfers to insiders.  Assignee Dec. at ¶ 72.  Furthermore, the Petitioning

Creditors have the ability to subpoena information in connection with the assignment

proceeding.

**LEGAL ARGUMENT**

**A.      The Motion for an Interim Trustee Should Be Denied as this Case is Subject to Dismissal.**

34.      As acknowledged by the Petitioning Creditors, an interim trustee should not be appointed " . . . in a case that will soon be dismissed." *See* Motion at ¶ 46 *quoting In re The Ctr. For Mgmt. & Tech., Inc.*, 2007 WL 3197221 (Bankr. D. Md. Oct 26, 2007).

35.      Here, although the Petitioning Creditors meet the requirements of Section 303(b) for an involuntary petition, there are grounds to dismiss the case under Section 305(a) or abstain from hearing this case.  Indeed, the Petitioning Creditors did not file the Motion until it was apparent that the Assignee would be moving to dismiss the case and to seek sanctions against the Petitioning Creditors for a bad faith filing.

36.      Section 305(a) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time, if . . . the interest of creditors and the debtor would be better served by such dismissal or suspension . . .".  11 U.S.C. § 305(a).  The legislative history of Section 305(a) provides as follows:  "The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in the arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment." *In re: Macke Intern. Trade, Inc.*, 370 B.R. 236, 247 (9th Cir. 2007) *citing* H.R. Rep. No. 95-595 at 325 (1977); S. Rep. No. 95-989, at 35-36 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6281-82, 5787, 5820-22.

37.      Courts routinely dismiss or abstain from hearing a case under Section 305(a)(1) when there is a pending proceeding for an assignment of the benefit of creditors.  *In re: M. Egan*

*Co., Inc.* 24 B.R. 189 (Bank. W.D.N.Y. 1982); *In re Cincinnati Gear Co.,* 304 B.R. 784 (Bankr. S.D. Ohio 2003); *In re A&B Liquidating, Inc.,* 18 B.R. 922 (Bankr. E.D. Va. 1982).

38.     Dismissal of an involuntary bankruptcy petition is appropriate in favor of a previously filed assignment for the benefit of creditors when the assignee's administration of an estate is competent and creditors would benefit from the continued administration of the estate by the assignee. *In re Baily's Beauticians Supply Company,* 671 F.2d 1063 (7th Cir. 1982).

39.     As will be further detailed in the Assignee's motion to dismiss, there are grounds to dismiss this case or abstain from hearing this matter, as the case will result in the estate losing approximately $3 million in preference claims.  *N.J.S.A.* 2A:19-3 provides that "[i]f any person being insolvent or in contemplation of insolvency shall, within 4 months before the making of a general assignment, and with the intention of preferring any creditor or person under liability for him, mortgage, pledge, assign, pay or transfer any of his property . . . such preferential transaction shall be void against the assignee."  Thus, under the statute, the Assignee can avoid preferential payments made by Scandia within 4 months of the Deed of Assignment, which amounts total in the aggregate approximately $3 million.

40.     While the Petitioning Creditors, without any factual support, state that all of the creditors will be better off if preference claims are not pursued because of the expense associated with collecting the claims, the Petitioning Creditors neither have adequate information to make this assessment nor can they speak for those creditors who did not receive a preference and have filed proofs of claims against the assignment estate. Thus, the filing of the involuntary petition was to further their own litigation strategy – to eliminate their preference exposure.

41.     Furthermore, the Petitioning Creditors filed the involuntary petition to have this Court act as an "appellate court" to undo the Assignee's sale of Scandia's assets to Seafood

Innovations.  Setting aside the fact that there is no basis to overturn such sale, the Petitioning

Creditors failed to timely appeal the January 13, 2017 Order approving the sale or move for

reconsideration.  Why should they be allowed to extend the appeal time and get a second bite of

the apple now?

42.    If this involuntary bankruptcy case proceeds, the implications could be

devastating.    Anytime an unsecured creditor gets sued for a preference in an assignment

proceeding (or is not content with how the case is proceeding), the unsecured creditor can sit

silently and allow the ABC proceeding to proceed and, once 90 days has elapsed from the

preference payments, file an involuntary bankruptcy case.

43.    As the case should be dismissed, the appointment of an interim trustee is

inappropriate.

**B. The Petitioning Creditors Have Not Met their Burden for the Appointment of an Interim Trustee.**

44.    Under Section 303(f) of the Bankruptcy Code, the alleged debtor is free to

continue to operate its business during the gap period from when an involuntary petition for

relief is filed and an Order for relief is entered.  Such right has been described as "[t]he most

important protection given [an alleged debtor] by the Code . . .". *In re: DiLorenzo*, 161 B.R. 752,

754 (Bankr. S.D.N.Y. 1993) quoting Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law*

*Manual,* ¶ 2.14, at 2–43 (Warren, Gordon & Lamont, Inc., 3d ed. 1992).  The legislative history

instructs that an alleged debtor should remain in control of his assets unless it is shown that he

"may attempt to abscond with assets, dispose of them at less than their fair market value, or

dismantle his business, all to the detriment of [his] creditors." Id. quoting H.R.Rep. 95–595, 95th

Cong., 1st Sess. 323 (1977); Senate Rep. No. 95–989, 95th Cong., 2d Sess. 33 (1978), U.S.Code

Cong. & Admin.News 1978, 5787, 6279, 5819.

45.     "There is limited case law applying section 303(g), no doubt because the request for such relief is rare." *In re: Diamondhead Casino Corporation*, 540 B.R. 499, 505 (Bankr. Del. 2015) (refusing to appoint interim trustee when petitioning creditors did not establish what loss would occur to the estate pending a determination on the alleged debtor's motion to dismiss). Despite the limited case law, the cases addressing section 303(g) make clear that an application for appointment of an interim trustee should be denied where no facts are alleged showing a necessity for appointment. *In re: Reed,* 11 B.R. 755, 757 (Bankr.S.D.W.Va.1981). The request for an interim trustee should not be granted in absence of an exceptionally strong need for doing so. *See In re: R.S. Grist Co.,* 16 B.R. 872, 873 (S.D.Fla.1982).

46.     In the instant case, the Petitioning Creditors have not established grounds under Section 303(g) of the Bankruptcy Code for an interim trustee. The Petitioning Creditors have no evidentiary proof to show that there will be a loss to the estate from now until the Court decides the Assignee's soon to be filed motion to dismiss. There has been no showing of a loss of assets as the Assignee Dec. makes clear that:

- the trademark had nominal value and was included in the sale of the business which sale the Petitioning Creditors seek to collaterally attack;

- there has been no evidentiary showing that the trademark or the prepared food line of business has any value beyond what was paid for the sale of the assets;

- the sale of Scandia's assets was for fair value in light of the appraisal including leased equipment and the purchasers' assumption of liability under the leases;

- there was no $3 million loan obtained by the insiders prior to the assignment;

- there was no additional $60,000 loan from NMC to fund the operations of the business prior to the sale;

- Pescatore has agreed to pay its outstanding receivables and the Assignee will pursue same once NMC has been paid in full;

- the Assignee is investigating and intends to pursue claims against insiders; and

- there has been no evidentiary showing that the creditors are better off without the preference claims (an issue that can and will be determined by the Court in connection with the motion to dismiss).

47.    Moreover, there is no risk of loss to the estate because the Assignee has agreed to standstill in proceeding with the ABC proceeding pending the determination of his motion to dismiss. No cases will be prosecuted, filed or settled until the Court adjudicates this matter. The Assignee will not make any payments to creditors, his professionals and/or himself. Under these circumstances, there is no risk that the assets of Scandia will be lost pending the motion to dismiss.

48.    Furthermore, while the Petitioning Creditors coin the motion as one for the appointment of an interim trustee, the reality is that they are seeking the removal of a court appointed fiduciary. Under the New Jersey Assignment statute, the removal of an assignee is contemplated only when ". . . any assignee shall embezzle, waste or misapply any part of the trust estate in his hands or under his control, or shall neglect or refuse to execute his trust, or to perform and obey any order or judgment of the court in respect of his trust, or shall remove from the state . . ." N.J.S.A. 2A:19-37. The Petitioning Creditors do not even come close to meeting this standard with their unsubstantiated allegations.

**C.    If the Court Finds that an Interim Trustee is Necessary, which is Not the Case, the Petitioning Creditors Should Be Forced to File a Bond.**

49.    In their Motion, the Petitioning Creditors acknowledge that Bankruptcy Rule 2001(b) imposes a bond requirement on any appointment of an interim trustee to "indemnify the debtor for costs, attorneys' fees, expenses, and damages allowable under § 303(i) of the Code." Fed. R. Bankr. P. 2001(b).

50.     Puzzlingly, the Motion goes on to state that the Petitioning Creditors' "Objection" explains why the "Alleged Debtor" is not entitled to attorneys' fees and costs. See Motion at ¶ 53. The "Alleged Debtor" has not appeared in the action and no "Objection" is located on the Court docket addressing the bond.

51.     As acknowledged by the Petitioning Creditors, the requirement of a bond is mandatory. See *In re: Center for Management and Technology*, 2007 WL 3197221 (Bankr. D. Md. 2007) where the Court required the posting of a bond where substantial fees and costs would be incurred to defend against involuntary petition. *See  also  In re James Plaza Joint Venture*, 62 B.R. 959, 963 (Bankr. S.D. Tex. 1986) ("If a trustee be appointed, a bond from said trustee is required by law to be placed in an amount sufficient to protect the involuntary defendant from all costs and losses occasioned by the appointment of an interim trustee which are allowable under 11 U.S.C. § 301(i).").

52.     In this case, there will be a substantial expense to the Assignee for defending against the involuntary petition especially if the Petitioning Creditors continue to raise *frivolous* claims without any evidentiary support.  Under these circumstances, a bond is appropriate should the Court find the appointment of an interim trustee is necessary.

**D.     In the Event this Case is Converted to Chapter 11, There is No Basis to Appoint a Chapter 11 Trustee.**

53.     For all the reasons set forth above and given the fact that the Petitioning Creditors have not set forth any evidentiary basis warranting the extraordinary relief they seek, there are no grounds to appoint a Chapter 11 Trustee in the event this case gets converted.

## CONCLUSION

54.     Based on the foregoing, including the Assignee's willingness to stand still, the

Petitioning Creditors' motion should be denied.

Dated: New York, New York          NORRIS, McLAUGHLIN & MARCUS, PA
       April 25, 2017


                                    /s/ Melissa A. Peña
                                    Melissa A. Peña