**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| In re | : | Chapter 7 |
|  | : |  |
| **SCANDIA SEAFOOD (NEW YORK), INC.** | : | Case No. 17-10744 (MEW) |
|  | : |  |
| Debtor. | : |  |

---

**BENCH DECISION DENYING MOTION BY THE NEW JERSEY ASSIGNEE FOR THE BENEFIT OF CREDITORS TO DISMISS THE INVOLUNTARY PETITION**

A P P E A R A N C E S

LAW OFFICES OF DOUGLAS T. TABACHNIK, P.C.
*Attorney for the Petitioning Creditors*
Freehold, New Jersey
  By: Douglas T. Tabachnik, Esq.

NORRIS McLAUGHLIN & MARCUS, P.A.
*Attorney for Donald F. Campbell, as Assignee*
New York, New York
  By: Melissa A. Peña

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

  We are here on the involuntary chapter 7 case of Scandia Seafood (New York), Inc. This is my final written bench decision as to rulings that were announced in open court on May 8, 2017.

  Scandia Seafood (New York), Inc. is a corporation organized under the laws of New York. It formerly was engaged in the business of selling both fresh fish and prepared foods. A number of creditors of Scandia filed an involuntary bankruptcy petition on March 28, 2017. I will not list them here but I will refer to them collectively as the "Petitioning Creditors."

  Under section 303 of the Bankruptcy Code, an involuntary case may be commenced by a petition filed by three or more creditors who have unsecured claims that are not contingent and not disputed and that aggregate at least $15,775.00. Here, there are nine Petitioning Creditors.

1

Collectively, they contend that they are owed $389,860.49. There is no dispute as to that fact, and the parties before me have confirmed that they do not contest the Petitioning Creditors' qualifications to commence a case under section 303(b)(1) of the Bankruptcy Code.

Section 303(h) of the Bankruptcy Code provides that, if there is opposition to an involuntary petition, an order for relief may only be entered if, after trial, the court finds one of two things: either that the debtor is generally not paying its debts as they come due (unless such debts are the subject of a bona fide dispute as to liability or amount); or if, within 120 days prior to the filing of the involuntary petition, a custodian was appointed or took possession of the debtor's property. Here, it is conceded that Scandia executed a Deed of Assignment, dated November 29, 2016, and filed that Deed of Assignment in New Jersey court on December 6, 2016. That filing had the effect of commencing a formal proceeding in New Jersey that is referred to, in the New Jersey statutes, as an assignment for the benefit of creditors proceeding.

New Jersey law provides that the debtor, as the assignor, may choose the person who will act as the assignee for the benefit of creditors. In this case, Scandia named Donald F. Campbell, Jr. as the Assignee. The parties agree, and have conceded, that Mr. Campbell is a custodian who was appointed, or who took possession of Scandia's property, within the meaning of section 303(h)(2) of the Bankruptcy Code. In addition, the involuntary petition was filed on March 28, 2017, which is within 120 days of both the execution of the Deed of Assignment (which is dated November 29, 2016) and the filing of the Deed of Assignment with the New Jersey court (which apparently happened on December 6, 2016). Again, the parties concede this is the case.

The Petitioning Creditors therefore satisfy the requirements for the commencement of an involuntary case under section 303 of the Bankruptcy Code. Mr. Campbell nevertheless argues that the involuntary petition should be dismissed. First, he contends that I should exercise my

2

discretion under section 305 of the Bankruptcy Code to abstain from hearing the case, and to dismiss it in favor of completion of the proceedings that are underway in New Jersey. Second, he contends that I should dismiss the case for cause under section 707 of the Bankruptcy Code. The alleged cause, in this instance, is Mr. Campbell's contention that the Petitioning Creditors have acted in bad faith, and that the filing of the involuntary petition, and in particular the timing of that petition, are just a litigation tactic to try to avoid potential liability in the New Jersey proceedings to repay preferences that the Petitioning Creditors allegedly received in the four months that preceded the commencement of the New Jersey proceeding. Mr. Campbell also asks that I award fees and expenses pursuant to section 303(i) of the Bankruptcy Code or pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure.

The Petitioning Creditors oppose the motion. They contend that the proceedings in New Jersey are being operated for the sole benefits of the prior owners of Scandia and of the attorneys who will work on the preference claims. They argue:

- that the former owners formed another company, Seafood Innovations, and bought the business from the Assignee for an inadequate price of only $45,000.00;
- that the Assignee entered into an interim management agreement with Seafood Innovations that was on bad terms;
- that, in their view, the prior sale did not include a valuable trademark, but that Seafood Innovations, nevertheless, is using that trademark, and they believe a chapter 7 trustee is needed in order to prevent the New Jersey Assignee from just handing that property over to Seafood Innovations;
- that the Assignee has filed preference actions against the Petitioning Creditors and others, in which the Assignee, himself, stands to receive 20 percent of the proceeds,

3

  and counsel handling the cases stands to receive another 40 percent, with the result (or so say the Petitioning Creditors) that the cases are really primarily for the benefit of lawyers, not creditors; and

- that they did not receive adequate notice of the various applications and motions in the New Jersey proceeding.

I conducted an evidentiary hearing on Friday, May 5, 2017. I received the following evidence at the hearing.

First, the declaration of Melissa A. Peña, filed as docket number 28 on the docket in this case on May 1, 2017, along with the four exhibits that were attached thereto, all of which were admitted without objection by the Petitioning Creditors.

Second, the declaration of Steven Mitnick, filed as docket number 29 on the docket in this case on May 1, 2017, along with four exhibits that were attached thereto, all of which were admitted into evidence without objection.

Third, portions (but not the entirety) of the declaration of Donald F. Campbell, filed as docket number 17 on the docket of this case on May 1, 2017. I also admitted into evidence 11 of the 12 exhibits that were attached to the Campbell declaration. More particularly, paragraph 36 of the declaration and exhibit "E" thereto were not admitted into evidence, although it turned out that the document that had been marked as exhibit "E" was later introduced during live testimony. Paragraphs 27, 28 and 29 of the declaration were admitted solely for the purpose of explaining actions that Mr. Campbell took and in response to complaints about the reasonableness of his actions and of his motives, and were not admitted as to the truth of any statements that were made to Mr. Campbell by other persons. In addition, statements in the declaration and supporting exhibits as to Mr. Campbell's opinions about the values of assets or of the Scandia business, and

4

about information he was told about such matters, were admitted solely for the purpose of explaining the reasons why Mr. Campbell took the actions that he took, and in response to complaints about the reasonableness of his actions and his motives in taking them, and not for the truth of any statements that were made to Mr. Campbell and reflected in the declaration.

Fourth, I admitted portions (but not the entirety) of the declaration of Mark Rudes, which was denominated a "Certification" rather than a declaration, and which was filed as docket number 35 on the docket of this case on May 4, 2017. I also admitted exhibit "A" thereto. More particularly, paragraphs 1 through 7, and 13 through 32, of the Certification were admitted solely for the purposes of explaining Mr. Rudes' motivations in filing an involuntary petition and in explaining the timing of that filing, and in response to accusations of bad faith motives, and not to show the truth of any of the statements made to Mr. Rudes by his counsel or the truth of the accusations that he has made about the conduct of Mr. Campbell as Assignee. Paragraphs 8, 9, and 12 of the Certification were admitted into evidence. The last sentence of Paragraph 10 was not admitted, but the rest of Paragraph 10 and Exhibit A to the Certification were admitted. Paragraph 11 of the Certification was stricken and not admitted.

Fifth, I received live testimony by Donald Campbell, Edward Phillips, and Mark Rudes.

Sixth, I received five additional exhibits into evidence. Exhibit 1 was an email that had originally been attached to Mr. Campbell's declaration and that contained a proposal by Seafood Innovations to buy certain assets. Exhibit 2 was the Deed of Assignment that Scandia executed in favor of Mr. Campbell. Exhibit 3 was a copy of a management agreement, under which Seafood Innovations was given the right to manage the business of Scandia during the period after the commencement of the New Jersey proceedings. Exhibit 4 is a financial statement, marked "Draft," for the period ended September 30, 2015, which Mr. Phillips said that he found among

the business records of Scandia.  Exhibit 5 is a draft tax return for the period ended September 30, 2015, which Mr. Phillips also identified as an item he found in the records of Scandia.

I make the following findings of fact based on the evidence that I received on Friday, May 5, 2017.

Mr. Campbell met with Mr. Tucker and Mr. Licht, the equity owners of Scandia, in November 2016, prior to the execution of the Deed of Assignment.  Mr. Campbell did not recall the details of the conversation but he acknowledged during his testimony that, at least in part, the conversation was an effort by the owners to get a sense, prior to the appointment of Mr. Campbell, as to how a proceeding might be conducted and how he would approach it.  At least one of the items they discussed, which is reflected in paragraph 6 of Mr. Campbell's declaration in evidence, was Mr. Tucker's interest in starting a new business that would buy the equipment owned by Scandia and that would maintain at least a part of the business formerly run by Scandia.

Mr. Tucker and Mr. Licht discussed these matters and what they hoped to accomplish in a proceeding, even though Mr. Campbell, as Assignee, was to be a fiduciary for the interests of creditors and not a representative of the interests of Mr. Tucker or Mr. Licht.

Mr. Campbell, in his own words in his declaration, had "numerous" conversations with Mr. Licht, Mr. Tucker and their representatives before an assignment occurred.  Mr. Licht identified another food distribution company named ACE Endico that sought to buy some assets and that also sought to hire Mr. Licht himself.  Mr. Campbell had discussions with ACE and with ACE's representatives about such a potential sale in late November, prior to the time he had even been appointed as an Assignee.  By his own admission, Mr. Campbell had no information at that time about the business or the values of Scandia's assets.

In addition, prior to the assignment, the owners of Scandia executed the management agreement with Seafood Innovations. They showed that agreement to Mr. Campbell and obtained his assent to its terms in advance of actually naming Mr. Campbell as Assignee for the benefit of creditors. The management agreement gave Seafood Innovations the right to manage the business formerly run by Scandia until such time as the Assignee could arrange a sale. In return, Seafood Innovations was entitled to retain for itself all of the profits earned from operating the business during that period. It appears that one effect of the management agreement was to hand over to Seafood Innovations all of the inventory that Scandia had on hand, while leaving behind all of the debts owed to the companies that had supplied that inventory. In effect, Seafood Innovations received cost-free inventory and retained all of the profits from selling that inventory.

After the Deed of Assignment was executed, notice of the commencement of the New Jersey proceeding was sent to each of the Petitioning Creditors, and each of them signed acknowledgements that they had received such notice.

After the New Jersey proceeding was commenced, Mr. Campbell decided that it was important to sell the assets of Scandia. The evidence shows that Mr. Campbell negotiated with only one party: namely, Seafood Innovations. He did not publish notice that the business was available for sale. He did not retain advisors to conduct a sale process. He did not send notices to other companies in the field. Mr. Campbell explained that he thought it was necessary to move quickly, but the evidence does not support that conclusion. He testified that Scandia was operating pursuant to the management agreement; one could quarrel with the reasonableness of the terms of that agreement, but its existence eliminated any emergency that might have otherwise arisen due to the potential spoilage of inventory or the need to keep equipment in use or the need to keep operating the business.

In a relatively short time, Mr. Campbell negotiated the deal to sell the Scandia assets to Seafood Innovations for a total price of only $45,000. During that time, Mr. Campbell obtained no advice at all from his retained advisors as to the values of the business, the values of the assets being sold, or the fairness of the proposed deal. The only work he did was a limited amount of due diligence in the form of an appraisal of the value of equipment that was used by Scandia, and as to the terms of the leases to which certain items were subject. Although Mr. Campbell identified the leases, there is no indication that he attempted to verify whether the leases were on favorable, below-market terms or what the values of the leases might be.

Mr. Campbell filed a motion on December 28, 2016 seeking approval of the proposed sale to Seafood Innovations. The state court in New Jersey scheduled a hearing for January 13, 2017. However, notice of the motion was not mailed to creditors until January 3, 2017. The Petitioning Creditors have complained about the amount of notice that they received, but it appears from the evidence that they did receive notice of the motion prior to the hearing date. None of them asked for more time, or objected to the sufficiency of the notice, or objected to the relief sought. The Petitioning Creditors did not appear in the New Jersey proceedings or oppose any of the actions taken by the Assignee prior to March 2017.

In late February or early March 2017, the Assignee filed preference actions against the Petitioning Creditors. He did so pursuant to NJSA 2A:19-7, which states that a payment made within 120 days prior to the commencement of a New Jersey proceeding for the benefit of creditors may be avoided if the payment was made with the intent to confer a preference and if the payment did so. By their own admission, it was the filing of these actions that prompted the Petitioning Creditors to look further at the New Jersey proceedings in which, prior to that time, they had not shown any interest.

Turning to the motions before me: the Petitioning Creditors seek entry of an Order for relief. Mr. Campbell argues that, instead, I should abstain from considering the chapter 7 case or dismiss it on bad faith grounds. As I noted, the Petitioning Creditors have established their rights to commence a chapter 7 case, so I should first consider whether I ought to abstain from considering the chapter 7 case.

Section 305(a)(1) of the Bankruptcy Code provides that "[t]he court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time" if "the interests of creditors and the debtor would be better served by such dismissal or suspension." The moving party has the burden of proving that abstention is proper. Courts in this District have held that abstention is not to be granted lightly, and instead is a form of "extraordinary relief." *See In Re RCM Global Long Term Capital Appreciation Fund*, *Ltd.*, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996).

Prior decisions in this district have identified a number of factors that may be relevant in deciding whether to abstain. In *In Re. Century/ML Cable Venture*, 294 B.R. 9, 37-38 (Bankr. S.D.N.Y. 2003), the court listed seven factors:

1. economy and efficiency of administration;

2. whether another forum is available to protect the interest of both parties or there is already pending proceeding in state court;

3. whether federal proceedings are necessary to reach a just and equitable solution;

4. whether there is an alternative means of achieving an equitable distribution of assets;

5. whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

9

6. whether a non-federal insolvency has proceeding so far in those proceedings that it would be costly and time-consuming to start afresh with the federal bankruptcy process; and

7. the purpose for which bankruptcy jurisdiction has been sought.

As in most instances where courts list factors to be considered, the list is not an exclusive one. Nor is there any preassigned weight to be attached to one factor as opposed to another. The overall inquiry is whether it is in the best interests of creditors and of the debtor for the court to abstain.

I will discuss these seven factors in a moment, but it is more useful first to discuss particular arguments that the parties have raised.

The Petitioning Creditors argue that a chapter 7 case is needed to protect a trademark that has not yet been transferred. I am not at all persuaded by this contention. The Assignee has committed not to transfer the trademark except after a further motion in New Jersey and approval by the New Jersey Court. There is no reason why the Petitioning Creditors could not get a full and fair hearing on any of the objections to the trademark transfer that they might have in New Jersey.

The Petitioning Creditors also challenged the terms of the prior deals that the Assignee has made. They argue that the agreements the Assignee has negotiated have served the interests of the prior owners, rather than the interests of Scandia's creditors. The Assignee argues that the Petitioning Creditors had the opportunity to be heard in New Jersey and should have complained to the New Jersey Court if they did not like the way the Assignee was handling things.

The evidence suggests that the New Jersey proceeding was of little interest to the Petitioning Creditors, at least prior to the time when they were sued in the preference actions. It

10

is not an answer, or at least not a complete answer, for the Petitioning Creditors to argue that they did not think anything very serious was going on in New Jersey. Parties have the right to ignore proceedings, but most of the time, they do so at their peril.

The Assignee concedes that a Chapter 7 Trustee would have the power to look at the prior transactions and, if they were done for an inadequate consideration, the power to take action to avoid them. However, I should be very hesitant to allow an involuntary bankruptcy case to be used as a way of potentially getting a "do-over" and to attack, in the Bankruptcy Court, matters that might procedurally be immune to attack in the New Jersey court. I should and will require a very strong evidentiary showing that something was amiss before I ought to let an involuntary bankruptcy case be used to upset proceedings in another court where parties did not take action.

I was skeptical before the hearing as to whether such a showing could or would be made. But, in fact, I believe that such a showing has been made in this case.

The evidence shows that the proposed fiduciary for the creditors spoke to the owners of the business before an assignment was made. They tried out their ideas on him as to how the proceeding was to be conducted. They introduced him to a potential buyer with whom he had sale discussions before he even had information about the company, and that was a buyer with whom one of the owners was to be associated.

With the Assignee's blessing and prior to the assignment for creditors, the owners signed papers appointing their own newly formed company as managers of the business, and gave to themselves all of the profits to be earned during the management period. The effect of this management agreement, as I have noted, was effectively to hand over the inventory to the owners' new company free of charge.

11

Then, after the assignment, the Assignee negotiated the sale to the new company run by the former owner. He did so without negotiating with anyone else; without conducting any marketing effort; without making any publication of the opportunity to buy the business or its assets; without any valuation of the business; and with virtually no input from his advisors as to the values of the business and assets and the fairness of the deal, with the minor exception of some advice on equipment leases.

Nothing I say today will be binding on these issues if there are further proceedings. I took evidence for the purpose of determining whether the bankruptcy case should proceed. If there is future litigation over the merits of any of the underlying transactions, it presumably would be based on a more complete factual record and with prior discovery. And so what I say today is not collateral estoppel or res judicata or in any way final as to the merits of those transactions.

However, the evidence that I have received suggests that there was an appalling lack of diligence in ensuring that the prior owners paid a fair price for keeping the business and its assets. A fiduciary for creditors has a duty to act diligently to maximize value for the creditors. As I mentioned, creditors have some responsibility to pay attention to legal proceedings, but they also have a right to assume that an Assignee, who is appointed as the representative of their interests, will act diligently to protect those interests. That means making sure that any sale, and any dealings with the equity owners, are on fair and proper terms. To use the Assignee's own words during his testimony: Mr. Campbell needed to be sure that he was obtaining the highest and best proposals that could be obtained for the business and assets. Instead, the evidence shows that Mr. Campbell set almost immediately to work on potential preference actions against creditors, while doing almost nothing to ensure that a proper value was obtained for the business itself and to ensure that the prior owners were not stealing value that should have belonged to creditors.

The Petitioning Creditors argue that in light of potential preference actions, a chapter 7 case would also be in the best interests of creditors and the debtor. On this particular point, however, the Assignee has the better argument.

New Jersey laws permits an Assignee to recover payments made within 120 days prior to the commencement of an assignment for the benefit of creditors proceeding if those payments were made with the intent to confer a preference and if they did confer a preference. N.J. Stat. Ann. § 2A:19-3. I have considered whether a chapter 7 Trustee might succeed to the right to assert such preference claims, but it does not appear that would be the case. Section 544 of the Bankruptcy Code states that a trustee may avoid transfers of property that are avoidable under applicable law by "a creditor holding an unsecured claim that is allowable under Section 502 of this title." 11 U.S.C. § 544(b)(1). In this case, New Jersey law does not give unsecured creditors the right to challenge preferences. Instead, it gives such a right to the Assignee in the case of an assignment for the benefit of creditors. At least one other court has considered the scope of Section 544(b)(1) in an analogous context and has concluded that a trustee does not succeed to the powers that a prior receiver or custodian would have had. *In Re Delta Group*, 300 B.R. 918, 922-24 (Bankr. E.D. Wis. 2003).

It appears that if I were to allow the chapter 7 filing the New Jersey preference actions may be nullified, and preferences could only be pursued under Section 547 of the Bankruptcy Code. In that case, preferences would be limited to payments made within 90 days prior to the filing of the involuntary petition. However, 90 days before the filing of the involuntary petition would be a date in late December 2016, almost a month after the commencement of the New Jersey proceeding. No payments have been made during that period – at least none have been identified to me – and so there would be no preference claims.

13

From the perspective of the Debtor, it is hard to see how the elimination of the preference claims would be a benefit. Plainly, the New Jersey proceeding, where such claims are available, would be better for the estate itself insofar as those claims are concerned.

As to the effects of the preference claims on creditors: the Petitioning Creditors make a number of mathematical arguments. First, they argue that the amount actually returned to creditors as a whole will be less than the amounts recovered from the creditors who are defendants in the preference cases. However, that is always the case in preference actions. The preference defendants pay whatever is exacted from them in judgments or settlement, but the amount that then goes back to the creditor pool is only the amount that is net of the costs of obtaining the judgment or settlement. This, by itself, is not a reason why preference claims should be negated. If it were, then there never would be a good reason to allow preference claims.

Similarly, the Petitioning Creditors argue that they themselves will be in a worse position as a result of the preference claims, and that their own recoveries will be lower. But, again, that is always the case if a defendant has a preference liability. In fact, the whole theory of the preference claim is that the defendant was able to receive more than it would have received if its claim had been processed in the bankruptcy. So by definition, the defendant's position, if it has a preference liability, is always worse once the preference has been repaid. That is the whole theory of the claim.

The Petitioning Creditors also argue that the total amount that will be demanded back from creditors by way of preference claims is more than the entire likely recovery to be paid out to creditors, so that the amount creditors would pay into the estate as a whole would exceed the amount they would get back. However, as in every preference claim, the real beneficiaries are the creditors who did not receive preferences. There are such creditors in this case, and if

preferences occurred, those other creditors unquestionably would benefit if the preferences were repaid. The fact that a very high percentage of creditors might be subject to the preference claims is not a good reason to come to this Court to ask that the claims be terminated.

The real objection here is not so much as to the pursuit of preference claims, but as to the huge percentages of the recoveries to be paid to counsel and the Assignee. However, New Jersey litigation counsel has agreed to forego the previously agreed to 40% contingency fee and to take whatever recoveries the New Jersey Court thinks are proper at the end of the case. I do not think, as a result, that the preference claims are grounds for me to allow the petition.

However, on the overall record I cannot find that it is in the interests of the estate, the debtor or creditors, for me to abstain from hearing this Chapter 7 case. It will remain to be seen whether there was any extra value for the business that was sold, or whether anything can be done at this point to retrieve it. I cannot and will not prejudge those issues. However, I am going to make sure that there is an independent fiduciary in place who can review what has happened and who can take action, if such action is proper.

The continuation of the Chapter 7 case may have the effect of ending the chance to pursue preference actions under the New Jersey statute. But in my judgment, it is far more important, and potentially far more remunerative to the estate and its creditors, for an independent fiduciary to review the pre-assignment dealings between the Assignee and the owners, to review the management agreement that was executed, and to review the sale that was made, so that those matters, if appropriate, may be subjected to challenge.

Putting all this in terms of the seven factors identified in the case law: as to factor one (economy and efficiency of administration), to some extent that factor favors the continuation and completion of the New Jersey case, rather than starting over again in another court. But, frankly,

15

that procedural issue is far less important than ensuring that creditors' interests are protected by a vigilant and diligent fiduciary.

As to factor two: there is another proceeding that is already pending. However, the record suggests that creditors are not receiving the attentive and diligent representation of their interests that they have a right to expect. And it is not clear whether creditors have any meaningful options in the New Jersey proceeding at this point to obtain a review of the agreements that the Assignee made.

As to whether federal proceedings are necessary to reach a just and equitable solution (which is factor number three), and whether the New Jersey proceedings provide an alternative means of achieving an equitable distribution of assets (which is factor number four), I believe that this chapter 7 proceeding is necessary for the reasons I have described. I do not do this lightly, and I would not have done it upon a lesser showing of reasons to be concerned about the agreements that had been made. But I think the evidence shows that a continuation of this proceeding is in the better interest of the estate and of the creditors.

Factor five (the possibility of out-of-court agreements) is not really relevant here. As to factor six (whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with a bankruptcy case): that is a factor that weighs in favor of abstention. But I have said before, the procedural concern is far less important than ensuring that creditors receive the protections to which they are entitled.

Finally, as to item seven (the reasons why this Court's jurisdiction is invoked): If the only point of this case was to try to terminate the potential preference liabilities, then I would have abstained. It is not a proper function of a federal bankruptcy filing to terminate a creditors'

16

liability for preferences under state law. However, I do not think that is the main point of the petition, and it is certainly not the reason why I have decided to deny the abstention motion.

I therefore deny the motion to abstain.

As to the separate argument that I should dismiss on grounds of bad faith under Section 707: that argument is premised on the idea that the only reason for a Chapter 7 case is that the Petitioning Creditors would like to escape their preference liability. I do not believe that is the only reason, and I have concluded that the other concerns raised by the Petitioning Creditors are valid and are sufficient to justify a continuation of the involuntary case. I therefore find that there is no ground for dismissal under Section 707.

Finally, since I have not dismissed the case, there is no basis for an award of attorneys' fees and costs under Section 303(i). There is also no basis for such an award under Rule 9011. To paraphrase: Federal Rule of Bankruptcy Procedure 9011 allows an award of fees and costs if a petition or other filing is made for an improper purpose, such as to harass or to cause unnecessary delay or increased cost, or if the positions urged in the petition are frivolous. There is no purpose to harass, to cause delay or to cause increased cost here. Similarly, the positions urged are not so inconsistent with the facts and the existing law to be considered frivolous within the meaning of Rule 9011. In fact, I have agreed with the Petitioning Creditors that the involuntary case should proceed.

I therefore deny the motion for award of attorneys' fees and costs. I will enter a separate Order that will reflect the rulings in this decision.

Dated: New York, New York
      May 12, 2017

                              /s/ **Michael E. Wiles**
                              UNITED STATES BANKRUPTCY JUDGE